UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ANDREAS BLIKAS, GREG GATES, JAMES M. FRY, JOSEPH A. GONZALES, MARK SHIFFLETT, AND MICHAEL D. BORGES, | Case No.: 3:09-CV-1324-AC |
| | FINDINGS AND |
| | RECOMMENDATION |
| Plaintiffs, | |
| v. | |
| RESTAURANTS UNLIMITED, a foreign corporation, | |
| Defendant. | |

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiffs Andreas Blikas, Greg Gates, James M. Fry, Joseph A. Gonzales, Mark Shifflet, and

Michael D. Borges (collectively "Plaintiffs") are suing their former employer, Restaurants Unlimited

Page 1- FINDINGS AND RECOMMENDATION                                          *{SIB}*

Inc. ("RUI") for violations of the federal Age Discrimination in Employment Act (29 U.S.C. §§ 621-634)("ADEA").   Presently before the court is RUI's motion for summary judgment or, in the alternative, for partial summary judgment.   The court finds that Plaintiffs have failed to present evidence sufficient to raise a genuine issue of material fact on a number of elements of a *prima facie* claim for age discrimination under the ADEA and that Shifflett failed to file his claim within the relevant statute of limitations.   Accordingly, RUI's motion for summary judgment should be granted.

### Preliminary Procedural Matter

In support of their opposition to RUI's summary judgment motion, Plaintiffs offer excerpts of deposition transcripts.  The excerpts include cover pages identifying the action, the deponent, and the date of the deposition.  The subsequent pages do not contain any identifying features and do not include a certification by the court reporter.  These exhibits have not been properly authenticated under Rule 901(a) of the Federal Rules of Civil Procedure.  In *Orr v. Bank of America*, 285 F.3d 764, 774 (9th Cir. 2002), the Ninth Circuit held that:

> A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. See Fed. R. Evid. 901(b); Fed. R. Civ. P. 56(e) & 30(f)(1).  Ordinarily, this would be accomplished by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted.  It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a "true and correct copy."  Such an affidavit lacks foundation even if the affiant-counsel were present at the deposition.

*Orr*, 285 F.3d at 774 (footnote and case citations omitted).  This court previously has applied *Orr's* rule to exclude improperly submitted testimonial excerpts.  *See, e.g., Chao v. Westside Drywall*, 709 F. Supp. 2d 1037 (D. Or. 2010), and *Kesey v. Francis*, No. CV. 06-540-AC, 2009 WL 909530 (D.

Or. April 3, 2009).  The deposition transcript excerpts offered by Plaintiffs are not admissible

evidence.  RUI, however, has offered and authenticated a number of excerpts from the depositions

of the same individuals, thereby providing the basis for their admissibility.  In *Orr*, the Ninth Circuit

held that:

> when a document has been authenticated by a party, the requirement of authenticity
> is satisfied as to that document with regards to all parties, subject to the right of any
> party to present evidence to the ultimate fact-finder disputing its authenticity.

*Orr*, 285 F.3d at 776.  Therefore, to the extent the deposition excerpts offered by Plaintiffs have also

been offered by RUI, those pages are properly authenticated and will be considered by the court.  The

remaining excerpts are excluded.

## Background

Pacific Coast Restaurants ("PCR") employed Plaintiffs as Chefs in numerous restaurants

across the greater Portland area in July 2007, when RUI acquired and merged with PCR and assumed

management of the PCR restaurants.  (Glarner Decl. ¶¶ 4-5.) By march 2009, Plaintiffs, who ranged

from the age of forty-five to sixty years old, had either been terminated or resigned from their

employment with RUI.  RUI attributes the terminations and resignations on RUI's management style,

which imposes stringent performance requirements on, and increases the accountability of, the Chefs.

Plaintiffs assert they were all terminated solely because of their age.

Under PCR's management structure, the restaurants were managed primarily through the

corporate offices rather than independently within each restaurant.  (Ideson Decl. ¶ 3.)  General

Managers were in charge of on-site management duties for the restaurants while Chefs were not held

accountable for food and labor costs, profitability, or training, and were treated with deference by

certain individuals in upper management.  (Ideson Decl. ¶ 4.)   General Managers and Chefs, who

did not have the authority to terminate employees, reported problematic employees to PCR's corporate offices. (Ideson Decl. ¶ 3.) PCR rarely terminated employees and instead transferred them to another restaurant. (Ideson Decl. ¶ 3.) In fact, PCR did not terminate any Chefs in the two years preceeding RUI's merger with PCR. (Galloway Decl. ¶ 18.)

RUI's management structure places more responsibility and accountability for a restaurant's success in the hands of the General Manger and Chef. RUI requires weekly FATT (flavor, appearance, temperature, and texture) reviews in which meals prepared by the Chef are compared to the underlying recipes. (Ideson Decl. ¶ 5.) RUI tracks a restaurant's total costs, rather than just labor costs, requires the Chefs to perform line checks[1] for each shift, rather than twice daily line checks, and imposes more rigid standards for line checks. (Ideson Decl. ¶ 6-7, Glarner Decl. ¶ 12.) The General Manager is held accountable for the Chef's performance and has the authority to terminate an underperforming Chef. (Ideson Decl. ¶ 8.) The Chef is expected to actively manage the restaurant and circulate though the kitchen overseeing the entire line, monitoring inventory, managing staff, and checking food quality and presentation on dishes before they are served to customers. (Ideson Decl. ¶ 9.) To succeed under RUI's standards, Chefs have to develop management skills in addition to exhibiting technical expertise in the kitchen. (Glarner Decl. ¶ 6.)

**Andreas Blikas**

PCR hired Blikas in April 1999 to work as a sous-chef in one of its restaurants. (Blikas Dep. 28:7-13.) PCR promoted Blikas to Chef in November 2000. (Blikas Dep. 29:15-17; Guettler Decl. Ex. F at 24.) During the period Blikas worked for PCR, he received regular pay raises and bonuses.

---

[1] "A line check involves inspecting back of the house operations to ensure food is being prepared safely and to the highest quality." (Ideson Decl. ¶ 7)

(Guettler Decl. Ex. F at 24.)  At the time RUI purchased PCR, Blikas was working as Chef at the Stanford's restaurant located in the Portland Airport.  (Blikas Dep. 32:3-8.)  During the transition from PCR to RUI, Blikas was nominated for Chef of the Year based on his performance as a PCR employee.  (Ideson Dep. 56:10-20.)

In September 2008, Derrick Provine, General Manager of the Airport Stanford's, completed a written assessment of Blikas's performance from April 2008 to August 2008.  (Blikas Dep. 64:3-7: Guettler Decl. Ex. F at 26.)   Provine found that Blikas was deficient in numerous key areas, including an inability to meet planned sales and kitchen costs goals, a failure to utilize key financial systems or report financial information in a timely and accurate manner, a lack of selection, development, and training of sous chefs and other kitchen staff, deficiencies in providing fast service, failure to apply RUI's systems and tools to ensure food quality, and that facilities and environmental standards and specifications were met.  (Guettler Decl. Ex. F at 27-28.)  However, Blikas scored high in kitchen environment and guest surveys, achieving 95% in shopper food quality scores, maintaining product safety and sanitation, and complying with health department regulations and company and government policies.  (Guettler Decl. Ex. F at 27-28.)  Provine placed Blikas on a development plan to increase his understanding and utilization of systems and tools to deliver results, and improve his commitment to training and development of sous chefs.  (Guettler Decl. Ex. F at 34.)   Approximately two months later, Chris Ideson, RUI Regional Director, visited and evaluated the Airport Stanford's during the lunch hour.  (Guettler Decl. Ex. F at 35.)  Ideson gave the restaurant a total score of 40.9%, with housekeeping, human resources, administration, front desk, and dining room scores all falling below 50%.  (Guettler Decl. Ex. F at 36-42.)  The only score above 50%, at 52.9%, was given for the food and beverage quality.  (Guettler Decl. Ex. F at 38.)

About this time, Ideson terminated Provine "for lack of leadership due the continued poor financial results at the Airport Stanford's", but gave Blikas a second chance with a new General Manager after counseling him on budget requirements and informing him that the Airport Stanford's exceeded its food budget more than any other RUI restaurant. (Ideson Decl. ¶ 10.)

In mid-November 2008, Genesis Carvey assumed the position as General Manager of the Airport Stanford's. At the time she took the job, she was aware of Blikas's recent performance evaluations and arranged to meet with Blikas for weekly interpersonal conferences to discuss his performance. (Ideson Decl ¶ 11.) Blikas regularly missed these meetings to work the line. (Ideson Decl ¶ 11.) Additionally, Ideson arranged for Rob Whaley, RUI's Food and Beverage Director, to provide individual training to Blikas on December 3 and 4, 2008. (Ideson Decl ¶ 12.) In his follow-up notes on his time at the Airport Stanford's, Whaley noted numerous concerns including improper food storage and labeling, use of old tools and procedures resulting in improper purchasing and food waste, failure to follow recipes, and below standard food quality. (Galloway Decl. Ex. A at 1.) Whaley instructed Blikas on RUI's expectations with regard to walk-throughs, line checks, recipe adherence/training, working the circle, and FATT review with follow-ups, and identified tools to be used to remedy the identified concerns. (Galloway Decl. Ex. A at 2.) Whaley's presence only made Blikas's deficiencies more evident to Carvey and Ideson. (Ideson Decl ¶ 12.) These deficiencies were discussed with Blikas, who agreed to work on improving his compliance with the RUI standards in the areas of finance and kitchen operations. (Blikas Dep. 134:1-24.)

Blikas had surgery and did not work from December 22, 2008, to February 27, 2009. (Guettler Decl. Ex. F at 43-48.) During his absence, Carvery completed a written review of Blikas's performance from November 17, 2008, to January 17, 2008. (Guettler Decl. Ex. F at 49.) Blikas's

performance was below standards in every category except food quality scores, safety and sanitation standards, meeting company and government policies, and technical expertise. (Guettler Decl. Ex. F at 50-55.) Carvey indicated that Blikas needed to improve his understanding of performance management, his conformance with RUI culture, systems, and tools, and his ability to get results through his crew. (Guettler Decl. Ex. F at 56.) In late March, 2008, Ideson again visited the Airport Stanford's and participated in a FATT review. (Ideson Decl ¶ 15.) The restaurant received low FATT scores due to poor food quality, including stale bread. (Ideson Decl ¶ 15.) Carvey recommended that Blikas be terminated based on his failure to respond to coaching and his deficiencies in his management responsibilities. (Ideson Decl ¶ 15; Guettler Decl. Ex. F at 60.) Ideson agreed and RUI terminated Blikas on March 30, 2008. (Ideson Decl ¶ 15; Compl. ¶ 1.)

Blikas was forty-nine years old at the time of his termination. Chris Hein was transferred from his position as Chef at the Stanford's in Clackamas to replace Blikas as Chef at the Airport Stanford's. (Galloway Decl. ¶ 5.) At that time, Hein was forty years old and had over ten years of experience at the Clackamas Stanford's. (Galloway Decl. ¶ 5.)

**Greg Gates**

PCR hired Gates in June 1994 and promoted him to Chef in November 1995. (Guettler Decl. Ex. D at 19-20.) In 2004, PCR transferred Gates to Marina Fish House at Riverplace in Portland, Oregon ("Marina Fish House"),[2] where he served in the capacity of Executive Chef. (Gates Dep. 133:12-15; Risner Decl. ¶ 3.) During his employment with PCR, Gates received annual raises and bonuses but received two written warnings – one for discharging an employee in violation of policy

---

[2]The Marina Fish House is also referred to as the Newport Seafood Grill at Riverplace. (Risner Decl. ¶ 1.)

in 1996 and one for poor performance in food quality, food cost, and housekeeping in on November 22, 2006, based on taste plates and visits from June through November 2006 – and a one-on-one counseling in 2005. (Guettler Decl. Ex. D at 19.) A written evaluation of the Marina Fish House dated April 27, 2007, revealed continuing problems with housekeeping, excessive labor costs, inadequate sous chef development, and excessive food waste due to prep levels and product ordering. (Guettler Decl. Ex. D at 35.) Ideson regularly rated Gates as one of the worst Chef's employed by PCR due to Gates's struggles with labor, kichen cleanliness, and food quality and cost. (Ideson Dep. 21:10-15.)

Gates problems continued after RUI's takeover of PCR. In July 2008, RUI promoted Allison Risner to the position of General Manager of the Marina Fish House. (Risner Decl. ¶ 3.) Risner immediately discovered that Gates was not scheduling adequate labor for the restaurant and had to borrow kitchen staff from other restaurants resulting in unnecessary overtime costs. (Risner Decl. ¶ 3.) She also became aware that Gates consistently failed to meet RUI standards in FATT reviews due to his failure to follow RUI recipes. (Risner Decl. ¶ 4.) Risner continually counseled Gates on the use of RUI tools to ensure the proper scheduling of labor and to maintain food quality. (Risner Decl. ¶¶ 3, 4.)

In a memorandum to Gates dated October 31, 2008, Risner summarized a conversation she had with Gates on October 28, 2008, identifying three areas of concern: 1) poor food quality due to infrequent line checks, proper labeling, overstocking the line, and ineffective and inconsistent FATT reviews; 2) high food costs due to improper ordering, prepping, and excessive waste based, in part, on failure to use the RUI purchase tracker; and 3) excessive labor costs due to failure to utilize the RUI labor tracking tools and costed schedules. (Guettler Decl. Ex. D at 36; Poor Decl. ¶ 4.) Risner

concluded "[w]ith your experience in the restaurant business we have every confidence that you will look on this as a challenge, and utilize all the resources you have to make sure that these concerns can be overcome.  However, if they are not resolved quickly & consistently further disciplinary actions will be taken." (Guettler Decl. Ex. D at 36.) Gates interpreted this document, coupled with the firing of other managers in a protected class, as an indication that he would be fired soon thereafter.  (Gates Dep. 212:1-6.) Shortly thereafter, Gates resigned and left his employ with RUI. (Gates Dep. 217:17-23.) Gates was forty-five years old when he resigned.

RUI replaced Gates with Les Martin, who was at least two years older than Gates, and who had previously worked as a Chef for PCR.  (Galloway Decl. ¶ 7.)  Martin also quit after just two months at the restaurant because he did not like the RUI management structure, policies and procedures.  (Glarner Decl. ¶ 16.)

**James M. Fry**

PCR hired Fry in 1984 who initially worked at the Newport Bay restaurant in Washington Square. (Fry Dep. 32:21-33-6.)   Fry was then reassigned to the Tigard Newport Bay restaurant before being transferred to the Portland City Grill in 2002 as Executive Chef.  (Fry Dep. 33:1-6: Holman Decl. ¶ 4.)  PCR assigned Walt Holman to the position of General Manager of the Portland City Grill in 2002 as well.  (Holman Decl. ¶4.)

Holman had concerns about Fry from the beginning and complained to Wes Curl, Vice President of Operations for PCR, that Fry was not actively involved in the cooking or training of the kitchen staff and was not developing the menu.  (Holman Decl ¶ 4.)  Curl and PCR co-owner, Al Fleenor, talked with Fry about Holman's concerns but nothing changed and Fleenor indicated that they were getting all they could out of Fry.  (Holman Decl. ¶ 4.)  Under the PCR management

structure, Holman had no authority to discipline so he did the best he could and continued to point out Fry's deficiencies in his performance reviews.  (Holman Decl. ¶ 5.)

When RUI acquired PCR in July 2007, Holman gained authority over Fry and attempted to improve Fry's performance with conferences, counseling, and required documentation.  (Holman Decl. ¶ 6.)  In September 2008, Holman completed a performance appraisal for Fry's performance from April 1, 2008, to September 1, 2008.  (Guettler Decl. Ex. B at 15-20.)   In the appraisal, Holman gave Fry high scores for virtually everything except implementation of, and compliance with, RUI's systems, tools, and timing standards.  (Guettler Decl. Ex. B at 17-18.)  Holman noted that Fry was still learning the technical aspects of the RUI system and that he was a work in progress.  (Guettler Decl. Ex. B at 20.)  He felt that Fry needed to stay cutting edge with the cuisine, provide more training to his sous chefs about how manage the restaurant under the RUI system, improve kitchen times, and open communication between kitchen staff and crew.  (Guettler Decl. Ex. B at 21.)  Throughout the fall of 2008, Holman continued to counsel Fry about becoming more involved in the kitchen, provide more training for his staff, and adequately control labor costs.  (Holman Decl. ¶ 6.)  Holman required Fry to meet with his sous chefs regularly to increase the performance of the RUI standards, and requested written documentation of the meetings, which he never received.  (Holman Decl. ¶ 6.)  In October 2008, in response to Fry's inability to identify menu specifications during a FATT review attended by Michelle Glarner, RUI Regional Director, Holman placed Fry on a food quality plan requiring Fry to personally conduct three FATT reviews a week and document the results.  (Holman Decl. ¶ 7.)

Notes from a line check performed by Brian Poor, RUI's Food and Beverage Director, at the Portland City Grill on December 30, 2008, revealed poor sanitary practices, poor food quality, food

stored at improper temperatures, and postdated or unlabeled products.  (Guettler Decl. Ex. B at 23-24.)  Poor discussed the results of the line check with Fry and advised him of areas that needed improvement.  (Poor Decl. ¶ 6.)  The issues were not resolved on January 6, 2009, or January 9, 2009, when Poor made follow-up visits to the restaurant.  (Poor Decl. ¶ 7.)

On January 19, 2009, Glarner expressed concern about continued guest complaints at Portland City Grill and attached a sample in which a customer complained about the seating, service, and food quality.  Less then three weeks later, the Portland City Grill was again the subject of a line check by Poor with a less than desirable outcome.  (Guettler Decl. Ex. B at 30-31.)  Due to high temperatures in the protein reach-in drawers, large amounts of fish, seafood, chicken, ham, and hamburger were thrown out.  Additionally, vegetables were warm, wilted, and brown; cheese was old, dry, and hard; sauces were discolored and either too warm or too cold; fish was overpurchased and cut with poor skill; and frozen items were thawed inappropriately.  (Guettler Decl. Ex. B at 30.)

On February 11, 2009, Holman met with Fry to discuss the results of the recent line check. (Holman Decl. ¶ 8.)  Holman advised Fry that his job was in jeopardy and that he had thirty days to improve his performance.  (Holman Decl. ¶ 8.)  Holman worked the thirty days but did nothing to improve his performance.  (Holman Decl. ¶ 8.)  On the thirtieth day, Fry came to the restaurant dressed for work, accepted his paycheck and shook Holman's hand, left the restaurant and never returned.  (Holman Decl. ¶ 8.)  Fry testified in his deposition that Holman pulled him aside in the hallway and said that "they want me to drop the hammer and this is it, so this is your last day." (Fry. Dep. 185:8-20.)  Holman denies making this statement.  (Holman Decl. ¶ 8.)  Additionally, Fry testified in his deposition that toward the end of his employment with RUI, he was getting frustrated and he asked Holman if he was doing a good job and that Holman assured him he was doing a good

job but that "[t]hey just don't want you here anymore." (Fry Dep. 161:6-13.)

Fry was sixty years old at the time he left RUI's employ. (Compl. ¶ 3.) RUI hired Craig Shaw to replace Fry as Executive Chef at Portland City Grill. (Galloway Decl. ¶ 8.) Shaw was approximately fifty-three years of age when he took over Fry's position. (Galloway Decl. ¶ 8.)

**Joseph A. Gonzales**

PCR hired Gonzales in January 1990 as a line cook at a restaurant in Lake Oswego, Oregon. (Gonzales Dep. 32:24-33:7.) He was promoted to sous chef a year later and eventually to Chef of the Stanford's in downtown Portland, Oregon, in the summer of 1998. (Gonzales Dep. 35: 20-25, 44:17-22.) In 1997, PCR issued Gonzales a written performance warning for failing to perform as a sous chef to company standards, noting that "many substandard food quality issues were evidence on his shift 1-10-97." (Gonzales Dep. 40:15-20, Guettler Decl. Ex. E at 26.) In February 2001, PCR issued a second written warning for failure to conduct accurate inventories which resulted in a four percent variance between actual and theoretical inventory, and a loss to PCR of $8,000 in lost inventory. (Guettler Decl. Ex. E at 27.) Three years later, Gonzales was again issued a written warning for failing to complete accurate inventories resulting in a three-percent increase in food costs above theoretical. Gonzales was warned that "unexplained variances of this nature will not be accepted in the future." (Guettler Decl. Ex. E at 28.)

When RUI assumed management of PCR's restaurants in July 2007, Gonzales was working as Executive Chef at the Jantzen Beach Stanford's. In June 2008, John Roth was hired as general manager of the Jantzen Beach Stanford's. (Roth Decl. ¶ 4.) Shortly thereafter, Roth noted that Gonzales had problems controlling food costs and lack control over his team. (Roth Decl. ¶ 4.) Roth counseled Gonzales about food costs in early September 2008, and later in the month provided

personal training and counseling to Gonzales in identifying food costs issues and utilizing RUI food and labor cost tools to control food and labor costs.  (Roth Decl. ¶¶ 4, 5.)  On October 6, 2008, Roth again discussed his concerns with Gonzales, advising him that he needed to improve in food ordering to avoid running out of food, decrease his labor cost to 9.5 percent and his food cost to 29 percent, or better, and confront and discipline his crew members.  (Roth Decl. Ex. A.)  Roth followed up with a conversation two days later advising Gonzales that a number of items that should have been completed the previous day – quizzes from sous chef, recipes posted, and scheduling for items being 5-stepped during the week – were not completed, complaining that the recipe book was incomplete, and reminding him of a recent horrible FATT review.  (Roth Decl. Ex. B.)  The items remained incomplete through the following day as well.  (Roth Decl. Ex. B.)

On October 13, 2008, Roth conducted a formal written coach-and-counseling session with Gonzales in which he addressed the horrible FATT review and the excessive food and labor costs. (Roth Decl. ¶ 10.) Roth advised Gonzales that he needed to maintain food costs at 29.5 percent or less and back of house labor costs at 9.5 percent or less and to show an immediate improvement in the food quality over the next few weeks based on FATT review, shopper results and external visits. (Roth Decl. Ex. C at 1.)   He also warned Gonzales that "any additional performance issues will result in further disciplinary action being taken, up to and including termination, and that you have already received a verbal warning on 10/9/2008."  (Roth Decl. Ex. C at 3.)   Gonzales did not remember and did not agree that he received a FATT score of 40 percent or that he didn't remember recipes during the FATT review.  (Gonzales Dep. 58:2-59:21.)  Gonzales also advised Roth that he would not be able to meet the standards set forth in the coach and counseling document.  (Gonzales Dep. 59:22-60:3, 64:2-9.)  Roth told Gonzales that if you "can't run the numbers, then you have to

find a new job." (Gonzales Dep. 64:15-17, 68:12-20.) Gonzales testified that a couple of weeks later, he overheard Roth tell another employee that "Joe's going to start training his replacement next week" and then chuckle. (Gonzales Dep. 79:9-12.)

Feeling as though he was being pushed out the door, Gonzales testified that he gave his keys to Roth and left. (Gonzales Dep. 83:21-24.) RUI represents that Gonzales gave notice of his intent to resign in early November 2008, with the resignation effective November 13, 2008. (Galloway Decl. ¶ 10.)

RUI replaced Gonzales with Mark Scott, who was then working as a sous chef for RUI in California and had previously worked as an Executive Chef in his own restaurant in Rhode Island. (Ideson Decl. ¶ 19.) Scott was at least sixteen years younger than Gonzales, who was forty-six years old at the time he gave his notice. (Galloway Decl. ¶ 10.) Under Scott's leadership, both the labor and food costs at the Jantzen Beach Stanford's improved and the food costs for January through March 2009 were under budget. (Roth Decl. ¶ 12.)

**Mark Shifflett**

PCR hired Shifflett as a Chef in July 1989 and assigned him to the Stanford's in Tanasbourne in 1997. (Shifflett Dep. 33:25-34:2, 42:9-23; Galloway Decl. ¶11.) Shifflett received several warnings, both oral and written, during his employ with PCR for various deficiencies, such as failure to store food items at proper temperatures resulting in low health inspection scores and, in at least one instance, a threat to close the restaurant if it did not meet standards on reinspection, failing to provide proper leadership and instruction to sous chef and other staff, failing to properly clean and maintain the kitchen area, poor food quality, and excess labor costs. (Guettler Decl. Ex. C at 31, 40-47.) During this period, Lorrie Anderson, General Manager of the Tanasbourne Stanford's,

recommended to PCR that Shifflett be terminated due to persistent problems with labor costs and food quality issues. (Anderson Decl. ¶¶ 1, 8.)  In September 2006, PCR denied Shifflett his annual raise as a result of these deficiencies, many of which occurred the previous year.  (Guettler Decl. Ex. C at 47.)  In January 2007, Anderson found that Shifflett had improved in all areas previously rated below standard and awarded him his wage increase effective the following month.  (Guettler Decl. Ex. C at 59.)

        After RUI took over in July 2007, Shifflett's performance problems continued.   On December 11, 2007, Anderson verbally counseled Shifflett on his continuing failure to control labor costs and his overall lack of leadership.  (Anderson Decl. ¶ 10.)  In January 2008, Anderson expressed her concern about Shifflett's poor kitchen productivity and his out-of-line labor costs in an email to Ideson.  (Guettler Decl. Ex. C at 60.)  Anderson explained that Shifflett ran one of the worst meals-per-man-hour rates of all Stanford's,  was putting the needs and wants of his kitchen staff over those of the restaurant and his team, was not acting as a team player, was ignoring input from others on his team, was not monitoring training, and was wasting money.  (Guettler Decl. Ex. C at 60; Anderson Decl. ¶ 10; Ideson Dep. 46:9-47:4 .)  She noted that Shifflett was able to improve for periods of time but would then resort to old ways, and that he did not accept responsibility for the issues in his restaurant.  (Guettler Decl. Ex. C at 60.) On April 14, 2008, Anderson again brought her concerns about Shifflett's continuing problems with labor costs to his attention after the restaurant was understaffed on a Saturday night and unable to meet demand, with ticket times ranging from forty-five to sixty minutes during the dinner rush, resulting in the "comping" of over $1,100 in meals.  (Guettler Decl. Ex. C at 86; Anderson Decl. ¶ 11.)  Anderson created an action plan to assist Shifflett to meet labor productivity standards in the immediate future.  (Anderson Decl. ¶

11.)  Anderson counseled Shifflet again on April 18, and April 21, 2008, when he failed to comply with the action plan.  (Anderson Decl. ¶ 11.)

On April 24, 2008, Anderson, Ideson, and Joe Devencenci, RUI's Vice President of Operations, attended a FATT review conducted by Shifflett.  (Anderson Decl. ¶ 12.)  Shifflett was unable to present food items that adhered to RUI recipes, despite previously receiving individual assistance from Whaley to improve his recipe knowledge.  (Anderson Decl. ¶ 12.)    In light of Shifflett's continuing problems with labor costs over the previous two years, and his regular disregard of RUI recipes, Anderson terminated Shifflett effective April 30, 2008.  (Anderson Decl. ¶ 13.)

Anderson was forty-seven years old at the time she terminated Shifflet, who was then fifty years old.  (Anderson Decl.¶ 3.)  RUI transferred Dylan Reish to the Tanasbourne Stanford's to replace Shifflett as Executive Chef.  (Galloway Decl. ¶ 13; Ideson Decl. ¶ 22.)  Reish, a veteran Chef in his mid-thirties, brought the Tanasbourne Stanford's back-of-house labor under budget in 2008 for the first time in many years.  (Galloway Decl. ¶ 13; Ideson Decl. ¶ 22.)

Shifflett filed a complaint with the Oregon Bureau of Labor and Industries ("BOLI") on May 20, 2009, asserting that he was terminated from his employment with RUI without cause.  (Guettler Decl. Ex. C at 65-66.)  In this BOLI complaint, he alleged he had discovered, within the past three hundred days, that he was replaced by someone substantially younger and less qualified and that RUI had engaged in a pattern of terminating older chefs.  (Guettler Decl. Ex. C at 65-66.)

**Michael D. Borges**

PCR hired Borges as a sous chef on July 16, 1988.  For most of his time with PCR, Borges worked as a Chef at the Riverplace Newport Bay restaurant in Portland, Oregon.  (Borges Dep.

21:19-24.)  PCR promoted Borges to the position of opening Chef at Henry's 12th Street Tavern restaurant ("Henry's) in 2004.  (Borges Dep. 21:24-22:4.)  Craig McKellar was the General Manager of Henry's throughout Borges's tenure as Chef.  (Borges Decl. 24:14-17.)

Prior to RUI's merger with PCR, Borges's had a few performance issues as a Chef.  On May 17, 2000, Borges received a performance warning for typing in the words "hug my nuts" on a ticket printed in the kitchen.  (Guettler Decl. Ex. A at 49.)  In March 2003, PCR management expressed concerns over Borges's treatment of coworkers, his "lashing out", and his unapproachability. (Guettler Decl. Ex. A at 19-20.)

After RUI purchased PCR, Borges had difficulty implementing and maintaining RUI's policies and procedures at Henry's.   In September 2008, Craig McKellar completed an appraisal of Borges's performance from April 2008 through September 2008.  (Guettler Decl. Ex. A at 21-35.) While sales for the restaurant exceeded the plan consistently and the restaurant received high marks for the institution of and compliance with RUI operating, safety and sanitation standards and procedures, Borges was not meeting the requirements for cost containment or staff training and retention.  (Guettler Decl. Ex. A at 24-26.)  McKellar felt Borges needed to improve in utilizing RUI measurement tools, planning, structure development, accountability, and coaching and teaching. (Guettler Decl. Ex. A at 35.)  To assist Borges in learning, understanding, and implementing the new systems, McKellar sent Borges to a two-week training session in Minnesota.  (Glarner Decl ¶ 24; Borges Dep. 133:10-25.)  Borges also attended various team meetings in Portland but declined the opportunity to train with experienced RUI Chefs in Seattle.  (Glarner Decl. ¶ 23; Borges Dep. 133:10-25.)  Despite this additional training and assistance, Borges's performance did not improve. (Glarner Decl. ¶ 25.)  In fact, McKellar suggested to Borges late in 2008 that he should look for

another job.  (Borges Dep. 197:20-198:1; Guettler Decl. Ex. A at 36.)

Borges requested time off from December 22-28, 2008.  (Guettler Decl. Ex. A at 36.)  This request was met with incredulity by Glarner, who commented that RUI never granted time off during the holidays and viewed Borges's request as "[a] huge flag that he isn't on board with the success of the restaurant, doesn't care about supporting his team or the mgmt team at what should be a super busy time & still seems to not understand that his job is on the line."  (Glarner Decl. ¶ 26;Guettler Decl. Ex. A at 36.)

On January 10, 2009, McKellar advised Borges in writing of serious performance deficiencies that were threatening his continued employment.  (Guettler Decl. Ex. A at 38.)  Borges's food cost to plan goals  variance was the highest in the company and he had failed to meet his plan goals throughout the fiscal year with a total shortfall of $127,000.  (Guettler Decl. Ex. A at 38-39.)  Borges had lost two sous chefs in the past few months and had one of the highest crew turnover rates in the company, resulting in excessive overtime.  (Guettler Decl. Ex. A at 39.)  A confrontation between Borges and Poor in 2008 made it impossible for the two to work together without the assistance of a corporate "go-between" and the accountability issues identified in the September 2008 appraisal had not been remedied.  (Guettler Decl. Ex. A at 39; Poor Decl. ¶ 11.)  McKellar informed Borges that his status as Chef at Henry's was under review and that he would be informed of a decision on his continued employment within 30 days.  (Guettler Decl. Ex. A at 40.)  Borges responded in writing, explaining his conduct and attempting to justify his performance.  (Guettler Decl. Ex. A at 41-45.)  He indicated that while he felt he was being pressured into quitting, he would not do so.  (Guettler Decl. Ex. A at 45.)  He concluded with:

It appears that RUI has decided to replace most if not all of the PCR Chef Staff in the

past 10 months and now it is my turn to be added to the list.  Nothing else can explain the sudden departure of Chefs from one company in such a short amount of time.  This is unfortunate.

(Guettler Decl. Ex. A at 45.)

McKellar, who was then fifty-two years old, terminated Borges on February 6, 2009. (Galloway Decl. ¶16.)  Borges was forty-five years old at the time.  (Compl. ¶ 6.)  RUI replaced Borges with Thomas Elkins, who was regional training chef for California Pizza Kitchen, had over nine years experience as a Chef managing back-of-house operations, and was thirty years old. (Galloway Decl. ¶ 17.)

## Legal Standard

Summary judgment is appropriate where  the " movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a) (2010).  Summary judgment is not proper if material factual issues exist for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Id.* at 324.  A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements.  *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. Fed. R. Civ. P. 56(c) (2010). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I. Statute of Limitations

RUI seeks summary judgment on the claim asserted by Shifflett on the basis of the applicable statute of limitations. Oregon is a deferral state under Title VII. Therefore, Shifflett was required to file a charge of discrimination within 300 days of the alleged unlawful employment action. 42 U.S.C. § 2000e-5(e)(1) (2007).

A plaintiff may not recover for "discrete acts of discrimination or retaliation," such as termination, failure to promote, refusal to hire, or a poor performance evaluation, "that occur outside the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 114 (2002).

"'[S]trict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" *Id.* (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)). While equitable doctrines such as tolling or estoppel apply, such doctrines should be used sparingly. *Morgan*, 526 U.S. at 113.

RUI terminated Shifflett on April 30, 2008. Shifflett filed his BOLI complaint on May 20, 2009, more than 300 days after his termination. At oral argument, Shifflett argued that his claim did not accrue, and the statute of limitations did not begin to run, until he discovered he had been replaced by someone younger. Shifflett does not allege in the complaint when he learned he had been replaced by someone younger but does represent in his BOLI complaint that "[w]ithin the past three hundred days, I learned that I was replaced by someone substantially younger and less qualified." (Guettler Decl. Ex. C at 90.) Shifflett has not offered, and the court has not found, any cases in which the statute of limitations for filing a charge of discrimination was tolled during the period the discharged employee did not know he had been replaced by someone younger.

Shifflett asserts that his termination was based on his age and was discriminatory. This is the discrete discriminatory conduct on which he bases his claim and which started the running of the statute of limitation. RUI's hiring of a younger individual to replace Shifflett is not a discrete discriminatory act or an independent unlawful employment practice – it is merely evidence Shifflett may rely on in support of his age discrimination claim. A claim for age discrimination may lie even without replacement by a younger worker. *Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F. Supp. 2d 1060 (D. Or. 2004)("Proof of the replacement element is not always required.). Therefore, Shifflett's lack of knowledge that he was replaced by a younger Chef does not effect, or toll, the applicable statute of limitations.

The statute of limitations on Shifflett's claim for age discrimination began to run on April 30, 2008, the date he was terminated. Shifflett did not file a charge of discrimination until May 20, 2009, more than a year, and clearly more than 300 days, after his termination. Shifflett's claim is barred by the statute of limitations. RUI is entitled to summary judgment on his claim.

## II. Age Discrimination

Under the ADEA, employers may not "fail or refuse to hire or to discharge any individual [who is at least forty years old] or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1)(2007). To survive summary judgment on an age discrimination claim, a terminated plaintiff must establish by a preponderance of either direct or circumstantial evidence that he would not have been terminated "but for" his age. *Gross v. FBI Fin. Servs. Inc.*, ___ U.S. ___, 129 S.Ct. 2342, 2351 (2009). "But for" causation requires a showing that age was the sole reason for the termination. *Id.* at 2350.

"Direct evidence, in the context of an ADEA claim, is defined as 'evidence of conduct or statement by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating fact in the employer's decision..'" *Enlow v. Salem-Keizer Yellow Cab Co.*, Inc., 389 F.3d 802, 812 (9th Cir. 2004)(emphasis omitted)(quoting *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999). Or, stated more succinctly, "direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)(quoting *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994)). Not every comment about a worker's

age is direct evidence of a discriminatory motive. "The Ninth Circuit has held a 'stray remark' that is 'uttered in an ambivalent manner and [is] not tied directly to [the plaintiff]'s termination is insufficient to create an inference of discriminatory motive.'" *Hartung v. Cae Newnes, Inc.*, 229 F. Supp. 2d 1093, 1100 (D. Or. 2002)(quoting *Merrick v. Farmers Inc. Group*, 892 F.2d 1434, 1438-39 (9th Cir 1990).

Absent direct evidence of a discriminatory motive, a terminated plaintiff may establish a *prima facie* case by showing that: (1) he is a member of the class protected by the statutes in question (at least forty years old); (2) he was performing his job in a satisfactory manner and in accordance with his employer's legitimate expectations; (3) he was terminated; and (4) he was either replaced by a substantially younger employee with equal or inferior qualifications or was discharged under circumstances otherwise giving rise to an inference of age discrimination. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000). This inference "can be established by showing that the employer had a 'continuing need for his skills and services in that his various duties were still being performed,'" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891 (9th Cir. 1994)(citation omitted), or by showing "that others not in his protected class were treated more favorably." *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1994).

### A. Direct Evidence

Plaintiffs' only offering of direct evidence of age discrimination is ageist comments made to Fry and Shifflett. These comments are allegedly found in the deposition transcripts offered by Plaintiffs, which were not properly authenticated and have been excluded by the court. Even assuming those transcripts were properly before the court, Plaintiffs failed to provide the designated page from Shifflett's deposition and Fry merely stated that someone, whom he could not identify,

once referred to him as "Grandpa" in fun.  This is nothing more than a "stray remark" and, as Fry is unable to remember who made the comment, can not be tied in any way to his termination. *Hartung*, 229 F. Supp. 2d at 1100 (stray remark not tied directly to employee's termination does not create inference of discriminatory motive).  Plaintiffs' direct evidence is insufficient to support a claim of age discrimination.

### B.  Circumstantial Evidence

RUI concedes that Plaintiffs have established the first element of the *prima facie* case for age discrimination – that they are within the protected class – but asserts that they are unable to establish the other three.  Specifically, RUI argues that Gates, Blikas and Fry, who were not replaced with individuals substantially younger then them, and Borges, who was terminated by someone also in the protected age group, are not able to present evidence of circumstances giving rise to an inference of age discrimination; that Gonzales and Gates resigned and, therefore, are not able to establish that they were terminated; and that all of the Plaintiffs are unable to show that they were  performing their jobs in a satisfactory manner in accordance with RUI's legitimate expectations.

### 1.  Circumstances Giving Rise to Inference of Age Discrimination

The evidence establishes that Gates was replaced with a Chef two years older than him at forty-seven years old, Blikas was replaced with a Chef nine years younger than him at forty years old, and Fry was replaced with a Chef eight years younger than him at fifty-three years old.  To create a presumption that a protected employees termination was discriminatory, the individual hired to replace the terminated worker must be "substantially" younger.  "In the age-discrimination context, such an inference can not be drawn from the replacement of one worker with another worker insignificantly younger." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).  The

Ninth Circuit has held that an age disparity of approximately nine and a half years is not sufficient to justify an inference of age discrimination. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1209 (9th Cir. 2008). In doing so, the court relied on the Seventh Circuit, which has consistently held that replacement employees must be at least ten years younger to justify a presumption of age discrimination. *Id*. (citing *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997).

Clearly, Gates, who was replaced by someone older than him, is unable to create a presumption of age discrimination based on the age of his replacement. In light of recent Ninth Circuit case law, the nine- and eight-year age difference between Blikas and Fry and their replacements, is also not enough to justify a presumption of age discrimination. Furthermore, the fact that RUI replaced Fry with a fifty-three year old Chef – older than either Gates, or Blikas, or their replacements – runs contrary to Plaintiffs' assertion that RUI was attempting to get rid of older Chefs.

While Borges was replaced with a Chef more than fifteen years younger than he, Borges was terminated by someone seven years older than he and within the protected age class. The fact that Borges was terminated by someone in the protected class diminishes the presumption that Borges was terminated because of his age. *Brown v. McDonald Douglas Corp.,* 936 F.Supp. 665, 676 n.6 (E.D. Mo. 1996) *aff'd,* 113 F.3d 139 (8th Cir. 1997)("The Court also notes that Ruethain was 40 years old and within the protected age group himself at the time he selected plaintiff for the layoff. This enhances the inference that age discrimination was not the motive behind plaintiff's termination."). Therefore, as with Gates, Blikas, and Fry, Borges is unable to justify a presumption of age discrimination based on the fact that his replacement was younger when viewed in light of the fact that the individual who terminated him was not only older but also within the protected age

group.[3]

The only other circumstance which might give rise to an inference of age discrimination is evidence that RUI allegedly terminated six Chefs within the protected group over a two-year period. However, in the absence of evidence with regard to the ages and performance history of the Chefs RUI retained during this same period, the mere fact that Plaintiffs were all over forty is not, in and of itself, sufficient to meet the fourth factor required for a *prima facie* case of age discrimination. RUI is entitled to summary judgment on the age discrimination claims asserted by Gates, Blikas, Fry, and Borges.

2.  Constructive Termination

The adverse action relied on by the Plaintiffs in support of their age discrimination claims is termination. However, the evidence establishes that Gates and Gonzales voluntarily resigned and were not fired by RUI.[4] Plaintiffs argue that these two employees were forced to chose to resign or be terminated and, therefore, were constructively discharged by RUI. In doing so, Plaintiffs rely on *Sheets v. Knight*, 308 Or. 220 (1989), *abrogated on other grounds by McGanty v. Staudenraus*, 321 Or. 532 (1995) and *Schnidrig v. Columbia Machine*, 80 F.3d 1406 (9th Cir. 1996).

To establish constructive discharge under federal law, a plaintiff must show that "working conditions [became] so intolerable that a reasonable person in the employee's position would have

_____

[3]This same argument applies to Shifflett, who was terminated by someone in the protected age group. However, as the court has found that Shifflett failed to filed his age discrimination claim in a timely manner, this argument is irrelevant.

[4]Plaintiffs also argue that Fry was forced to resign or be terminated. However, RUI appears to concede that Fry was terminated and that he has met this element of the prima facie case for age discrimination. Accordingly, the court need not, and will not, consider this argument with regard to Fry.

felt compelled to resign[.]" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004).  Under Oregon law, a plaintiff who alleges that he was told to resign or be fired has stated a claim for wrongful discharge.  *Sheets*, 308 Or. at 228.  In a footnote, the court explained that the threat must be unconditional and that a statement from an employer that "I will fire you unless your job performance improves" is not sufficient.  *Id*. at 228 n.5.  The Ninth Circuit impliedly adopted this view in *Schnidrig*, by holding that an employee who "was not demoted, did not receive a cut in pay, was not encouraged to resign or retire, and was not disciplined" does not state a viable constructive discharge claim.  *Schnidrig*, 80 F.3d at 1412.  Despite evidence that Schnidrig was: 1) replaced as head of the company by a man 15 years younger than he; 2) not given a new position; 3) earning less than another vice-president, after the other vice president was given a pay raise; 4) forced to move out of his office into a smaller office; 5) excluded from a lunch meeting with officers from the company's bank; and 6) was not receiving information about financial or other matters from other executives at his employer's direction, the court found that "his working conditions were not so intolerable and discriminatory that a reasonable person would feel forced to resign."  *Id*. at 1411-12.

Neither Gates nor Gonzales were told unconditionally that if they didn't resign, they would be fired.  The evidence establishes that Gonzales was not performing up to RUI standards and was told that additional performance issues will result in further disciplinary action being taken, up to and including termination.  Gonzales responded that he would not be able to meet the RUI standards and was told that if you "can't run the numbers, then you have to find a new job."  (Gonzales Dep. 64:15-17, 68:12-20.)  He later overheard his General Manager tell another employee that "Joe's going to start training his replacement next week" and then chuckle.  (Gonzales Dep. 79:9-12.) Gonzales then gave his keys to his General Manager and left.  Similarly, the evidence establishes that

RUI was counseling Gates for various performance issues and was advised that "[w]ith your experience in the restaurant business we have every confidence that you will look on this as a challenge, and utilize all the resources you have to make sure that these concerns can be overcome. However, if they are not resolved quickly & consistently further disciplinary actions will be taken." (Guettler Decl. Ex. D at 36.)   In response to this letter, Gates resigned.

Neither Gates nor Gonzales were performing up to RUI standards.  Both were advised of their deficiencies by RUI and were receiving assistance from RUI to remedy these deficiencies.  Both Gates and Gonzales thought it was inevitable that they were going to be fired.  However, the possibility that an employee may be fired if he fails to improve his performance is not sufficient to establish that the employee has been constructively discharged.  Gate and Gonzales are unable to establish that they were terminated by RUI.  Accordingly, RUI is entitled to summary judgment on their claims.

### 3. Performing up to legitimate expectations

RUI has presented ample evidence that none of the Plaintiffs were performing up to RUI's expectations and that they were terminated as a result of such poor performance. Plaintiffs do not contest this evidence or the resulting conclusion but argue that age was at least a part of the reason for their termination.   The Supreme Court made it clear in *Connor* that a plaintiff asserting an age discrimination claim "must prove that age was the 'but-for' case of the employer's adverse decision." *Connor*, 129 S. Ct. at 2350.  Accordingly, mixed-motive claims cases are no longer viable in the context of the ADEA.   Plaintiffs have failed to present evidence to support the second factor of *prima facie* case of age discrimination and RUI is entitled to summary judgment on all Plaintiffs' claims.

Page 28- FINDINGS AND RECOMMENDATION                                    *{SIB}*

*Conclusion*

RUI's motion (#29) for summary judgment should be GRANTED and Plaintiffs' complaint should be dismissed in its entirety.

<u>Scheduling Order</u>

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **September 2, 2011**.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 18th day of August, 2011.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge